## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Normand Dumais, Jr., et al.**

      v.

**United States of America, et al.**

Case No. 22-cv-112-PB
Opinion No. 2023 DNH 101

## MEMORANDUM AND ORDER

A former state firefighter and his wife sued the United States ("government") under the Federal Tort Claims Act ("FTCA") after the firefighter suffered serious injuries while using equipment owned by the government. The government filed a motion to dismiss for lack of jurisdiction, arguing that the plaintiffs' claims fall outside the FTCA's limited waiver of sovereign immunity. Because I conclude that portions of the plaintiffs' claims are barred by the misrepresentation and discretionary function exceptions to the FTCA's waiver of immunity, I grant the motion in part and deny it in part.

## I.   BACKGROUND

Normand Dumais, Jr. was employed by the State of New Hampshire as a firefighter at the Pease Fire Department ("Fire Department" or "Department") in Newington. Doc. 1 at 3. The Department is situated on an Air National Guard base and provides firefighting services to the base as well

as an adjacent civilian airport. Doc. 34-2 at 3. The Department is operated pursuant to a cooperative agreement between New Hampshire and the United States, whereby New Hampshire agrees to provide firefighting services for the military base and the United States agrees to reimburse the state for certain associated expenses. Doc. 29-4 at 70, 72. When the events that give rise to this action occurred, the Base Fire Chief ("Chief") was a federal employee but all other members of the Fire Department were employed by the state.[1] Doc. 29-3 at 3-4. Entry-level firefighters, such as Dumais, were directly supervised by higher-ranking state firefighters, who in turn reported to the Chief. Id. at 4-5.

The Fire Department uses firefighting equipment supplied by the federal government, including two foam trailers. Id. at 4. The foam trailers store large amounts of Aqueous Film-Forming Foam ("AFFF"), a substance used for combatting aircraft fires. Doc. 34-2 at 3; Doc. 34-1 at 3. Each trailer is fitted with a pump that circulates the AFFF. Doc. 34-1 at 3.

On July 15, 2019, Dumais was performing a routine "operations check" on one of the foam trailers. Doc. 1 at 3; Doc. 34-2 at 3. After turning on the pump to ensure that it was working properly, Dumais noticed that it was making an abnormal sound and attempted to turn it off. Doc. 1 at 4. Before

---

[1]    In 2021, the New Hampshire National Guard transitioned all firefighters at Pease to federal employees. Doc. 29-5 at 5.

he could do so, the pump exploded, shooting pressurized AFFF into Dumais' eyes, nose, and mouth and knocking him backwards several feet. Id. As a result, Dumais sustained serious injuries, including chemical burns and a concussion, and continues to suffer from ongoing cognitive issues and a heightened risk of developing cancer. Id.

Pursuant to the FTCA, Dumais and his wife, Amanda Ames, filed suit against the United States for negligence and loss of consortium.[2] Id. at 4, 6. Dumais' negligence claim is based on multiple theories, including that the government failed to appropriately (1) select and install the pump, (2) maintain and inspect the trailer, (3) train its employees on the proper maintenance of the trailer, (4) warn Dumais about the pump's dangerous condition, and (5) develop and implement policies regarding the use of the trailer. Id. at 4-5; see also Doc. 34-1 at 2. Ames' loss of consortium claim alleges that, as a result of the government's negligence, she suffered the loss of Dumais' companionship. Doc. 1 at 6.

The government has filed a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure,

---

[2] The plaintiffs also brought several claims against ASM Industries Inc., the manufacturer of the pump. Doc. 1 at 7. Those claims are not subject to the present motion.

arguing that the plaintiffs' claims are barred by sovereign immunity because they fall outside the FTCA's limited waiver of immunity. Doc. 29 at 1.

## II.  STANDARD OF REVIEW

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is first evaluated to determine whether the facts relevant to the jurisdictional issue are intertwined with the merits of the plaintiff's claims. Torres-Negron v. J&N Records, LLC, 504 F.3d 151, 163 (1st Cir. 2007). If the jurisdictional issue does not depend on facts that bear on the merits of the claim, the court can weigh the evidence to decide whether it has jurisdiction. Id. If, however, facts material to the jurisdictional question are also material to the merits of the cause of action, the court evaluates the motion to dismiss using the familiar summary judgment standard. Id. Under this standard, the motion to dismiss may be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (quoting Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1558 (9th Cir. 1987)). Otherwise, the case must "proceed[] to trial, so that the factfinder can determine the facts," at which point jurisdiction will be reevaluated. Id.

## III.  ANALYSIS

The FTCA, codified at 28 U.S.C. § 2674, provides a federal cause of action for plaintiffs to "bring certain state-law tort suits against the Federal

Government." Brownback v. King, 141 S. Ct. 740, 745 (2021). Pursuant to 28 U.S.C. § 1346(b), the United States has waived its immunity to suits brought under the FTCA, but only to the extent that the claims are "actionable." FDIC v. Meyer, 510 U.S. 471, 477 (1994). A claim is actionable if it is:

> [1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Id. (quoting 28 U.S.C. § 1346(b)) (alterations in original). Even where these elements are satisfied, a claim nonetheless must be dismissed if it falls within one or more of the statutory exceptions enumerated in 28 U.S.C. § 2680. Muniz-Rivera v. United States, 326 F.3d 8, 12 (1st Cir. 2003). If a claim is excepted or otherwise not actionable, then the FTCA's waiver of immunity does not apply, and the court lacks subject matter jurisdiction over the matter. Wood v. United States, 290 F.3d 29, 35 (1st Cir. 2002).

The government asserts that the plaintiffs' claims fall outside the FTCA's waiver of sovereign immunity for at least four reasons.[3] First, the

---

[3]     The parties appear to agree that, if Dumais' negligence claims are barred, so too are Ames' loss of consortium claims. See Brouillard v. Prudential Prop. & Cas. Ins. Co., 141 N.H. 710, 718 (1997) (noting that "loss of consortium is a consequential damage derivative of the [spouse's] injuries"). The parties do not distinguish between Dumais' claims and Ames' claims, and I follow their lead in addressing the two claims together.

government argues that there is no analogous liability under state law because the plaintiffs' claims are barred by New Hampshire's Workers' Compensation statute. Second, the government asserts that the plaintiffs' claims are precluded by 28 U.S.C. § 2680(h), the so-called "misrepresentation exception," to the extent that they are premised on its failure to warn Dumais' about the pump's dangerous condition. Third, the government contends that the plaintiffs' claims are precluded by 28 U.S.C. § 2680(a), referred to as the "discretionary function exception," because the claims arise out of the performance of discretionary governmental functions. Finally, the government asserts that the plaintiffs have failed to establish that the alleged negligence was committed by federal employees as opposed to independent contractors. I consider each argument in turn.

## A.   Workers' Compensation Bar

Because the FTCA only waives the government's immunity to the extent that a private party in analogous circumstances would be liable under state law, the court lacks jurisdiction if "a private person under 'like circumstances' would be shielded from liability pursuant to a state statute[.]" In re FEMA Trailer Formaldehyde Prods. Liab. Litig., 668 F.3d 281, 289 (5th Cir. 2012). The government argues that it would not be liable under state law because it was Dumais' borrowing employer and is therefore shielded from suit by § 281-A:8 of the New Hampshire Revised Statutes. Section 281-A:8

provides that employees may not sustain an action against their employer for injuries covered by that employer's workers' compensation insurance. It further provides that the spouse of an employee covered by workers' compensation insurance may not sustain an action against that employees' employer. N.H. Rev. Stat. Ann. § 281-A:8, II; see also O'Keefe v. Associated Grocers of New Eng., Inc., 117 N.H. 132, 134 (1977). The immunity provided by the statute applies to "general employer[s]" as well as "borrowing employer[s]." LaVallie v. Simplex Wire & Cable Co., 135 N.H. 692, 694, 697 (1992). A borrowing employer is one who, for a particular purpose or period of time, obtains the rights to the services of another employer's employee, although the employee remains employed by his original employer. See id. at 694. That is, "the servant of A may, for a particular purpose or on a particular occasion, be the servant of B, though he continues to be the general servant of A and is paid by him for his work." Id. (quoting Indemnity Ins. Co. v. Cannon, 94 N.H. 319, 320 (1947)).

    In determining whether a particular entity is a borrowing employer under § 281-A:8, New Hampshire has adopted a nine-factor test substantially similar to the test enumerated in § 220 of the Restatement (Second) of Agency. See id. at 695. Under this test, the court must consider "all relevant factors" under the "totality of the circumstances," including (1) the employer's right to control the details of the employee's work, (2) whether the employee

was "engaged in a distinct occupation or business," (3) whether the employee's occupation was one in which work would generally be supervised by an employer, (4) the level of skill required for the employee's position, (5) whether the employer supplied the "instrumentalities, tools and the place of work," (6) whether the employee was paid "by the time, or by the job," (7) whether the work performed by the employee was "part of the regular business of the employer," (8) whether the parties believed they were creating an employment relationship, and (9) whether the employer enjoyed the right to "summarily discharge[]" the employee. Id. Additionally, the court may consider whether the employee implicitly or explicitly consented to an employment relationship with the employer. See Appeal of Longchamps Elec., Inc., 137 N.H. 731, 735 (1993).

Whether an entity is an employer within the meaning of § 281-A:8 is a question of fact, see Cont'l Ins. Co v. N.H. Ins. Co., 120 N.H. 713, 716 (1980), on which the defendant bears the burden of proof, see Leeman v. Boylan, 134 N.H. 230, 234 (1991); see also Young v. Doucette, 2018 DNH 137, 2018 WL 3321435, at *4 (D.N.H. July 3, 2018). This question directly bears on both the merits of the plaintiffs' claims and the court's jurisdiction. See Brownback, 141 S. Ct. at 749 (holding that whether a defendant was immune under state law implicated both the merits of the case and the court's jurisdiction under the FTCA). Thus, I treat the motion to dismiss as I would a motion for

summary judgment, and consider whether the government has demonstrated that it was Dumais' employer as a matter of law. See Torres-Negron, 504 F.3d at 164; see also Izard v. United States, 946 F.2d 1492, 1497 (10th Cir. 1991); Rivera v. U.S. Army Corps of Eng'rs, 891 F.2d 567, 568 (5th Cir. 1990).

The government contends that, although New Hampshire was Dumais' general employer, it was his borrowing employer and therefore is immune from liability under § 281-A:8. The government asserts, in the first instance, that it necessarily enjoys immunity under § 281-A:8 because it was obligated to pay for Dumais' workers' compensation insurance. See Doc. 29-4 at 3. Regardless, the government argues, the LaVallie factors indicate that it was Dumais' borrowing employer. The plaintiffs respond that neither the fact that the government paid for the insurance nor the LaVallie factors compel a finding that the federal government was Dumais' borrowing employer. I agree.

As an initial matter, that the government was obligated to pay for Dumais' insurance is by no means determinative. To the contrary, the New Hampshire Supreme Court has emphasized that whether an entity is a borrowing employer "is not dependent upon whether the borrowing or lending employer provided the required workers' compensation coverage for the employee in question." See LaVallie, 135 N.H. at 694. The cases relied on by the government are not to the contrary. Although the New Hampshire

Supreme Court stated in passing that "[i]mmunity from employee tort suit is concomitant with the borrowing employer's obligation to provide workers' compensation insurance coverage," it made this statement only to emphasize a difference between Massachusetts and New Hampshire law; namely, that borrowing employers in New Hampshire are both financially responsible for workers' compensation insurance and immune from suit. See Benoit v. Test Sys., Inc., 142 N.H. 47, 51 (1997). The statement thus explains the consequences of being a borrowing employer, but it does not touch on when an entity is a borrowing employer. Nor was that issue before the court in Benoit, as the plaintiff conceded that the defendant was her borrowing employer. Id. The other cases relied on by the government interpret other state statutes which, unlike § 281-A:8, explicitly shield from liability any employer that pays for an employee's workers' compensation benefits. See, e.g., Willoughby v. United States, 730 F.3d 476, 481 (5th Cir. 2013); Roelofs v. United States, 501 F.2d 87, 90 (5th Cir. 1974); Britton v. United States, 659 F. Supp. 448, 449 (S.D. Fla. 1987).

Thus, I must consider whether the government has demonstrated that it was Dumais' borrowing employer under the LaVallie factors. Arguably the most important consideration is who retained the right to control the details of Dumais' work. See Currier v. Amerigas Propane, L.P., 144 N.H. 122, 125 (1999) ("under the New Hampshire Workers' Compensation Law, a

distinguishing feature of an employer-employee relationship is the ability of the employer to control the employee's work performance."). It is important that the right to control pertains to the "physical performance or the details" of the employee's work, as the right to assign tasks does not, without more, establish a right to control. See Boissonnault v. Bristol Fed. Church, 138 N.H. 476, 478-479 (1994). Thus, a purported borrowing employer that provides "general instructions" or even a "daily agenda" to contracted employees cannot claim the right to control where the general employer nonetheless retains the right to "determine[] the manner in which [the employee] would complete the tasks set out."  See Longchamps, 137 N.H. at 736.

Oftentimes, the right to control is evinced by the actual exercise of control. See, e.g., id. (concluding that an entity was not a borrowing employer where only the general employer exercised control over the details of the employee's work); accord Larson, Larson's Worker's Compensation Law § 67.01 (2011) (noting that "the borrowing principal's actual exercise of control" is evidence of a right to control). But here, all parties agree that the government did not exercise control over the details of Dumais' work. Doc. 29-3 at 4-5; Doc. 34-2 at 3. Indeed, the government emphasizes throughout its briefing that "the State of New Hampshire—not the United States— controlled the details of all relevant firefighter activities[.]" Doc. 29-1 at 27; see also id. at 11, 26 ("The United States did not, in any way, shape, or form,

control the state firefighters' 'detailed physical performance' of their work.");
Doc. 29 at 2.

Of course, an employer may possess the right to control an employee's
work even if that right is seldom exercised. See Restatement (Second) of
Agency § 220 cmt. d. But, on the present record, there is insufficient evidence
that the government retained this admittedly unexercised right. The parties
have not pointed to any agreement that explicitly provided the federal
government with the right to control the state firefighters.[4] Cf. LaVallie, 135
N.H. at 696 (finding that a borrowing employer had a right to control an
employee where "[t]he terms of the contract placed [the employee] under the
direction" of the borrowing employer); accord Larson's Worker's
Compensation Law § 67.01 (noting that right to control may be evidenced by
"an express agreement between the general employer and the borrowing
principal that directly evidences a transfer of control over the employee to the
borrowing principal"). Although it is undisputed that the Chief, a federal

---

[4]     Although not specifically discussed by the parties in their briefing, I
note that the cooperative agreement between New Hampshire and the United
States provides that: "ANGFPA [Air National Guard Fire Protection
Activities] employees, work under the day to day supervision of the Base Fire
Chief or his/her designee." Doc. 29-4 at 74. However, it is not clear that state
firefighters, such as Dumais, were considered "ANGFPA employees,"
particularly given that the agreement variably refers to "State firefighters"
and "State employees" as seemingly distinct from ANGFPA employees. Id. at
74-75.

employee, was the "program manager" for the Fire Department and "responsible for the overall management" of the Department, it is not clear that this entitled the Chief to control the <u>details</u> of the state firefighters' work. <u>See</u> Doc. 29-3 at 3. Indeed, the Chief's job description states that he must provide "overall direction and vision to the subordinate unit chiefs" and "[p]lan[] work for accomplishment," but does not on its face indicate that he was empowered to issue commands as to the details of the firefighters' work. <u>See</u> <u>id.</u> at 30. To the contrary, the cooperative agreement placed the responsibility on New Hampshire to "supervise" and "manage" "all activities or projects within the scope of" the agreement, including firefighting services. <u>See</u> Doc. 29-4 at 47. Moreover, while it is undisputed that the Chief "supervise[d]" the supervisory firefighters and that they "reported" to him, there is no evidence that this hierarchical structure enabled the Chief to issue commands regarding the details of the lower-ranking firefighters work, as opposed to merely provide general instructions or dictate tasks for accomplishment. <u>See</u> Doc. 29-3 at 5, 30. While it is possible, and perhaps even likely, that the Chief possessed the ability to issue such commands, I cannot conclude as much from the present record.

Nor do the remaining factors necessarily indicate that the government was Dumais' employer. Rather, at least some of the undisputed evidence would seem to weigh against such a finding. For example, firefighting

undoubtedly requires specialized skills, despite the fact that it does not require an advanced degree, as evidenced by the specialized training and certifications that firefighters must obtain. See Doc. 34-2 at 3; Doc. 29-2 at 17; cf. Longchamps, 137 N.H. at 737 (concluding that "[a]n electrician's job requires significant skill" in light of the specialized training required). Additionally, Dumais averred that he did not believe he was entering into an employment relationship with the federal government. See Doc. 34-2 at 2. The government has neither challenged this assertion nor provided evidence that it believed it was creating an employment relationship with Dumais. See Doc. 34-3 at 27 (statement by the United States that "all full-time firefighters working at Pease prior to at least 2020 were employees of the State of New Hampshire" and that "Plaintiffs should contact the State of New Hampshire for complete rosters of firefighters at Pease"). And it is undisputed that the government lacked the authority to unilaterally hire or fire state firefighters. See Doc. 29-3 at 5.

To be sure, the record also contains substantial evidence that could weigh in favor of a finding that the government was a borrowing employer. See, e.g., id. at 4 (United States owned the property where the Fire Department was located and supplied at least some of the Department's equipment); Doc. 29-4 at 5 (Dumais was paid by the hour); Doc. 29-5 at 6 (firefighting services at other National Guard bases are provided by federal

employees and are critical to the Air Force's mission). But it is up to a jury to weigh this conflicting evidence in light of the LaVallie factors. Although it would certainly be reasonable for a jury to conclude that the government was Dumais' employer, the government has not demonstrated that a jury would be compelled to do so. Accordingly, given the record provided at the present stage, I decline to dismiss the plaintiffs' claims on this basis.

**B.    Misrepresentation Exception**

The government next contends that, to the extent the plaintiffs' claims are premised on its failure to warn Dumais that the pump was in a dangerous condition, they are precluded by the misrepresentation exception to the FTCA. See 28 U.S.C. § 2680(h). The plaintiffs argue that the exception is inapplicable because their claims hinge on the "negligent performance of operational tasks" rather than on a false representation. Doc. 34-1 at 17. Because the application of the misrepresentation exception bears on both the merits of the plaintiffs' claims and the court's jurisdiction, I consider the parties' arguments under the summary judgment standard. See Bell v. United States, 127 F.3d 1226, 1228 (10th Cir. 1997).

Section 2680(h) states that neither the FTCA's substantive cause of action nor its waiver of immunity applies to claims "arising out of . . . misrepresentation[.]" The term "misrepresentation" encompasses a "wide range of communicative activity," including the failure to communicate.

15

Muniz-Rivera, 326 F.3d at 13; see also Zelaya v. United States, 781 F.3d 1315, 1334 (11th Cir. 2015). The exception does not apply, however, to claims that center "not on the Government's failure to use due care in communicating information, but rather on the Government's breach of a different duty." Block v. Neal, 460 U.S. 289, 297 (1983). In determining whether the exception applies, courts must look to the substance, rather than the form, of the claims. See JBP Acquisitions v. United States, 224 F.3d 1260, 1264 (11th Cir. 2000) (cited favorably in Muniz-Rivera, 326 F.3d at 13).

The complaint makes clear that the plaintiffs' claims are based in part on Dumais' reliance on the on the government's silence as reassurance that the pump was safe, and that this reliance caused his injuries. See Doc. 1 at 3-5. Claims, such as this, that depend upon reliance on a government communication or non-communication are precisely what the misrepresentation exception prohibits. See Lawrence v. United States, 340 F.3d 952, 958 (9th Cir. 2003); JBP Acquisitions, 224 F.3d at 1265; Commercial Union Ins. Co. v. United States, 928 F.2d 176, 179 (5th Cir. 1991). This is true regardless of whether the law imposes an affirmative duty on the government to communicate certain information. See United States v. Neustadt, 366 U.S. 696, 706 (1961); see also Preston v. United States, 596 F.2d 232, 237 (7th Cir. 1979). Accordingly, federal courts—including the First Circuit—have generally concluded that claims based solely on a failure to

16

warn are barred by the misrepresentation exception. See, e.g., Muniz-Rivera, 326 F.3d at 13 (claims that government failed to warn about flooding risk); In re FEMA Trailer, 713 F.3d at 812 (claims that government failed to warn inhabitants about formaldehyde exposure in government-provided emergency shelters); see also Green v. United States, 629 F.2d 581, 584 (9th Cir. 1980) ("The misrepresentation exception has been held to bar suits based on the failure to give any warning to injured parties."); Abbey v. United States, No. 20-cv-06443-JD, 2023 WL 218960, at *4 (N.D. Cal. Jan. 17, 2023) (collecting cases and noting that "failures to disclose and warn are claims that are encompassed by the misrepresentation exception").

In arguing that the misrepresentation exception is nonetheless inapplicable, the plaintiffs analogize their claims to those in Ingham v. E. Air Lines, Inc., 373 F.2d 227, 239 (2d Cir. 1967). In Ingham, the Second Circuit concluded that the plaintiffs' claims that a federal air traffic controller caused an airplane crash by conveying false weather information to a pilot were not precluded by the misrepresentation exception. Id. The court reasoned that the "gravamen of the complaint" was not reliance on a false statement, but rather the "negligent performance of operational tasks"—namely, air traffic control services—to which communication was merely incidental. See id. But, unlike in Ingham, the plaintiffs here do not identify any "operational task" relevant to their failure to warn claims, and I can conceive of none. Indeed,

the only applicable duty identified in their complaint is the duty to communicate. See Doc. 1 at 4 (asserting that the "United States had a duty to warn others using the Subject Pump of its dangerousness"). Thus, the plaintiffs' claims must be dismissed to the extent that they challenge the government's failure to warn Dumais about the dangers of the pump.[5]

## C.   Discretionary Function Exception

The government next asserts that the plaintiffs' remaining claims are barred by the discretionary function exception. See 28 U.S.C. § 2680(a). Section 2680(a) bars claims based upon the performance of "a discretionary function or duty" of the federal government, "whether or not the discretion involved be abused." The purpose of the exception is to "immunize[] conduct of government employees that arises from 'legislative and administrative decisions grounded in social, economic, and political policy'" in order to "protect[] against 'liability that would seriously handicap efficient

---

[5]    The plaintiffs state in passing that the misrepresentation exception is "typically applied in contractual and economic matters" and that their claims are distinct because they are not focused on "contractual misrepresentations[.]" Doc. 34-1 at 17-18. To the extent the plaintiffs intend to argue that the misrepresentation exception applies only to contractual representations or commercial transactions, that argument has not been adequately briefed and, in any event, has been largely rejected. See, e.g., Kim v. United States, 940 F.3d 484, 493 (9th Cir. 2019); Najbar v. United States, 723 F. Supp.2d 1132, 1136 (D. Minn. 2010); Russ v. United States, 129 F. Supp.2d 905, 909 (M.D.N.C. 2001); Washington v. HUD, 953 F. Supp. 762, 778 (N.D. Tex. 1996).

government operations." Carroll v. United States, 661 F.3d 87, 99 (1st Cir. 2011) (quoting Wood, 290 F.3d at 36).

In determining whether the discretionary function exception applies, courts engage in a two-step inquiry. First, the court must "identify the conduct that allegedly caused the harm." Shansky v. United States, 164 F.3d 688, 690-691 (1st Cir. 1999). Next, the court will inquire "whether this conduct is of the nature and quality that Congress, in crafting the discretionary function exception, sought to shelter from tort liability." Id. at 691. This latter inquiry encompasses two questions. First, "[i]s the conduct itself discretionary?" Id. Conduct is non-discretionary only where a "federal statute, regulation, or policy specifically tells federal officials to act a particular way." Reyes-Colon v. United States, 974 F.3d 56, 60 (1st Cir. 2020); see also Muniz-Rivera, 326 F.3d at 16. To render conduct non-discretionary, the relevant authority "must be 'directly applicable' to the challenged conduct" and must provide specific directions rather than general guidelines. Sanchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 97 (1st Cir. 2012) (quoting Muniz-Rivera, 326 F.3d at 16). If the conduct is non-discretionary, then the discretionary function exception does not apply and the inquiry is complete. See Wood, 290 F.3d at 36.

If, however, the conduct is discretionary, then the court proceeds to the second question: "[I]s the discretion susceptible to policy-related judgments?"

Shansky, 164 F.3d at 691. In answering this question, courts "start with the presumption that the exercise of discretion by a government official implicates a policy judgment." Carroll, 661 F.3d at 104. Generally, decisions "about which reasonable persons can differ" and that are "informed by a need to balance concerns about a myriad of factors" implicate policy judgments. Fothergill v. United States, 566 F.3d 248, 253 (1st Cir. 2009). Only where the conduct is both discretionary and susceptible to policy-related judgments will the discretionary function exception apply. See Shansky, 164 F.3d at 691.

The plaintiffs bear the burden of demonstrating that the conduct at issue was not susceptible to policy analysis and therefore not shielded by the discretionary function exception. Davallou v. United States, 998 F.3d 502, 505 (1st Cir. 2021). Whether the claims are precluded by the exception implicates both the merits of the plaintiffs' cause of action and the court's jurisdiction. See Pringle v. United States, 208 F.3d 1220, 1223 (10th Cir. 2000). Accordingly, I evaluate the application of the exception under the summary judgment standard. See Sanchez, 671 F.3d at 96-97. In performing this inquiry, I analyze each theory of negligence separately. See Wright & Miller, 14 Federal Practice & Procedure § 3658.1 (4th ed. 2023).

1.    Selection and Installation

The plaintiffs assert that the government was negligent in part because it selected and installed a pump that incorporated rubber parts. In their

view, this decision was non-discretionary under UFC 3-600-01, a policy

issued by the Department of Defense that applies generally to Air National

Guard bases. See Doc. 35-2 at 3-4. Sections 9-9.2.1 and 9-9.2.2 of the UFC

state that "[f]oam solution piping" and "[f]oam concentrate piping" must be

made of steel. The plaintiffs supplied an affidavit from Peter Glismann,

seemingly offered as an expert witness, who opined that the government

violated UFC 3-600-01 by selecting a pump with rubber parts. Doc. 34-14 at

3. In response, the government submitted an affidavit from Lieutenant

Colonel Autumn Ricker, the Base Civil Engineer for the Pease Air National

Guard Base, who asserted that the UFC applies only to buildings and their

equipment, and therefore does not apply to foam trailers. Doc. 35-2 at 2, 4. To

support her conclusion, Ricker points to § 1-2.3 of the UFC, which states that

its provisions do not apply to "fire department operations, staffing, and

firefighting equipment[.]" Id. at 4.

Despite the seemingly conflicting averments, Glismann's affidavit is far

too conclusory to create a genuine dispute of material fact. See Medina v.

Cram, 252 F.3d 1124, 1133 (10th Cir. 2001) ("an expert opinion may not be

sufficient to overcome summary judgment if 'it is conclusory and thus fails to

raise a genuine issue of material fact.'") (quoting Matthiesen v. Banc One

Mortg. Corp., 173 F.3d 1242, 1247 (10th Cir. 1999)). As the First Circuit has

recognized, an expert opinion that consists of "nothing but conclusions—no

facts, no hint of an inferential process, no discussion of hypotheses considered and rejected," is insufficient to present a genuine dispute of material fact. Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993) (quoting Mid-State Fertilizer v. Exchange Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir 1989)). Here, Glismann simply outlines his qualifications and background before stating his opinion. He does not provide any reasoning or support for his conclusion, nor does he grapple with the language of § 1-2.3. See Viterbo v. Dow Chem. Co., 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."). Indeed, Glismann's affidavit does not even identify the section of the UFC that the government allegedly violated, even though the UFC addresses a wide range of topics and spans more than 200 pages. Given the infirmities in their proffered evidence, the plaintiffs have failed to make the requisite showing that UFC 3-600-01 renders the government's conduct non-discretionary.

Furthermore, the selection and installation of the pump is susceptible to policy related judgments because it involves consideration of the government's operational needs as well as the costs and benefits of different models. See Kohl v. United States, 699 F.3d 935, 944 (6th Cir. 2012) ("the government's decisions as to what equipment to use and how to use that equipment fall under the discretionary-function exception, absent governing

standards or directives."); accord Brown v. United States, 790 F.2d 199, 203 (1st Cir. 1986). Accordingly, the plaintiffs' claims are barred to the extent that they are premised on the government's selection and installation of the pump.

2.   Failure to Inspect

The plaintiffs next assert that the government was negligent in part for failing to perform annual inspections of the trailer in 2018 and 2019. In arguing that annual inspections were non-discretionary, the plaintiffs point to UFC 3-601-02. Section 2-2.9 of this UFC provides a schedule of various "inspecting, testing, and maintenance" tasks that must be regularly performed for certain foam systems. To support their claim that the government violated this provision, the plaintiffs again rely on Glismann's affidavit. Glismann opines that UFC 3-601-02 applies to the trailer and that the government violated it in failing to perform annual inspections. Doc. 34-14 at 3. But Ricker, the government's witness, counters that the UFC applies only to buildings and their trappings—not foam trailers. Doc. 35-2 at 4. And, much like UFC 3-600-01, § 1-7.1 of UFC 3-601-02 explicitly exempts "[f]ire department operations, staffing, and equipment" from its coverage.

Glismann's opinion as to this claim is again too conclusory to create a genuine dispute of material fact. The affidavit only outlines his ultimate conclusion that the UFC was violated. It does not isolate the operative

section, much less provide any factual support or insight into Glismann's reasoning. See Hayes, 8 F.3d at 92 (to prevent summary judgment, expert affidavits "must at least include the factual basis and the process of reasoning which makes the conclusion viable"). Thus, there is insufficient evidence that UFC 3-601-02 rendered the government's conduct non-discretionary.[6]

Moreover, the plaintiffs have not successfully rebutted the presumption that the challenged conduct was susceptible to policy decisions. The frequency of inspection turns on a number of policy considerations, such as the equipment's inherent risk and the human and financial capital required to perform inspections. See Gonzalez v. United States, 851 F.3d 538, 547 (5th Cir. 2017) (concluding that decisions regarding the inspection and maintenance of bicycle trails were susceptible to policy considerations). Accordingly, the plaintiffs' claims must be dismissed to the extent they are premised on the failure to perform regular inspections.

---

[6]     The plaintiffs also invoke a 2016 memorandum from the Department of Defense, which states that Base Civil Engineers should "[p]erform required maintenance of the fire suppression system" pursuant to UFC 3-601-02. Doc. 34-10 at 20-21. This memorandum does nothing to aid the plaintiffs' argument. As an initial matter, it explicitly addresses foam systems in airplane hangars. See id. More fundamentally, it only incorporates the requirements of UFC 3-601-02 which, as I have explained, the plaintiffs have not established apply to the trailer.

3.      Failure to Develop Policies

The plaintiffs also claim that the government was negligent in part for failing to develop policies regarding the use of the pump. While the precise activity at issue is less than clear, the plaintiffs appear to argue that the government was negligent in failing to institute a policy against daily operations checks of the foam trailer. The plaintiffs principally rely on a 2016 Memorandum from the Department of the Air Force regarding "PFCs of Concern." Doc. 34-11 at 36 (cleaned up). The memorandum directs Air Force personnel to "[i]mmediately halt routine, daily operational checks and testing of the foam discharge systems on Air Force fire-fighting vehicles, unless the resulting effluent can be contained[.]" Id. at 37.

Ricker, the government's witness, averred that the memorandum is inapplicable because operations checks of foam trailers do not result in the release of effluent. Doc. 35-2 at 6. Moreover, the government notes that the policy applies only to "Air Force fire-fighting vehicles," which the foam trailer is not. The plaintiffs do not challenge these assertions or otherwise supply evidence that the memorandum applies to foam trailers.[7] Accordingly, the

---

[7]     In a different portion of their brief, the plaintiffs note that "[b]etween 2016 and July 15, 2019, there were 11 reported AFFF leaks" at the base. Doc. 34-1 at 9. But the evidence shows that none of these leaks occurred during an operations check of a foam trailer (with the exception of the incident giving rise to the plaintiffs' claims). See Doc. 34-13 at 3-5. Thus, this evidence does not contradict Ricker's statement that such operations checks do not involve

plaintiffs have not presented a genuine dispute that the conduct was non-discretionary. Nor have they demonstrated that the conduct was not subject to policy considerations. Indeed, it seems that whether and when to conduct operations checks turns on policy-laden considerations, such as the value of operations checks and the time and manpower required to perform the checks. See Baum v. United States, 986 F.2d 716, 724 (4th Cir. 1993) (decisions about "how best to allocate resources" are shielded by the discretionary function exception). For these reasons, the plaintiffs' claims are dismissed to the extent they are premised on the failure to develop policies against operations checks.

4.      Training and Supervision

The plaintiffs next assert that the government negligently failed to "properly train and provide supervision to those responsible for operating and maintaining the pump[.]" Doc. 1 at 5. The plaintiffs do not identify a policy that would render the conduct non-discretionary, but nonetheless assert that it was not subject to policy considerations.

As an initial matter, decisions about the level of training and supervision provided are generally susceptible to policy considerations and therefore guarded by the discretionary function exception. See Attallah v.

_____

the release of effluent.

United States, 955 F.2d 776, 784 (1st Cir. 1992) ("how, and to what extent the [government] supervises its employees certainly involves a degree of discretion and policy considerations of the kind that Congress sought to protect through the discretionary function exception."); Vickers v. United States, 228 F.3d 944, 950 (9th Cir. 2000) ("decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield."). It is true that, as the plaintiffs note, the discretionary function exception does not apply to decisions that are so beyond the pale that "no reasonable observer would see them as susceptible to policy analysis." See Hajdusek v. United States, 895 F.3d 146, 152 (1st Cir. 2018). Nonetheless, it is the plaintiffs' burden to demonstrate that the challenged conduct falls "outside the realm of possible policy decisions." See Davallou, 998 F.3d at 507.

Here, the plaintiffs do not specify the training or supervision that allegedly was or was not provided. Without this information, I cannot conclude that the government's actions were so woefully insufficient that they could not have been the product of policy considerations. See id. at 506 (noting that, absent allegations about what precisely the government did, the plaintiff could not "carr[y] his burden of alleging facts that could support a finding that [the government] exhibited such complete disregard for public safety that its decisions could not have been driven by policy analysis").

Therefore, the plaintiffs' claims are barred by the discretionary function exception to the extent they are based on the government's failure to provide adequate training or supervision.

    5.   <u>Negligent Maintenance</u>

The last remaining claim is that the government negligently maintained the trailer by overtorquing the bolts on the pump. <u>See</u> Doc. 34-1 at 12; <u>see</u> <u>also</u> Doc. 34-11 at 46. The plaintiffs do not identify any particular policy on point, but nonetheless contend that the contested actions are not susceptible to policy considerations. I agree.

The degree of rotational force applied to a bolt is not the sort of "decision[] grounded in social, economic, and political policy" that the discretionary function exception is meant to immunize. <u>See</u> Carroll, 661 F.3d at 99 (quoting Wood, 290 F.3d at 36); <u>see</u> <u>also</u> Terbush v. United States, 516 F.3d 1125, 1133 (9th Cir. 2008) ("matters of routine maintenance are not protected by the discretionary function exception because they generally do not involve policy-weighing decisions or actions."). Applying an unreasonable amount of force to a bolt is more akin to negligently operating a vehicle, which the Supreme Court has recognized would "obviously" fall outside the scope of the discretionary function exception. <u>See</u> United States v. Gaubert, 499 U.S. 315, 325 n.7 (1991). Although both actions "require[] the constant exercise of discretion," it is not the sort of discretion that is "grounded in

regulatory policy" and therefore does not receive the protection of the discretionary function exception. Id. Accordingly, the plaintiffs' claims may proceed to the extent they are based on the assertion that federal employees overtorqued the bolts on the pump.

## D.   Independent Contractor Exception

As I explained, the FTCA only waives immunity for claims based on the alleged negligence of government employees. See 28 U.S.C. § 1346(b)(1). "The FTCA expressly does <u>not</u> waive the government's immunity for claims arising from the acts or omissions of independent contractors." See Carroll, 661 F.3d at 93 (emphasis in original); <u>see also</u> 28 U.S.C. § 2671. Thus, under what is commonly referred to as the independent contractor exception, claims must be dismissed for lack of jurisdiction to the extent they are premised on the actions of "government contractors whose daily operations are not closely supervised by United States officials[.]" See Carroll, 661 F.3d at 92; <u>see also</u> United States v. Orleans, 425 U.S. 807, 813-814 (1976).

The government asserts that the independent contractor exception bars the plaintiffs' sole surviving theory of liability because the evidence indicates that state firefighters were responsible for maintaining the pump. In the government's view, if the state firefighters were not borrowed employees under § 281-A:8, then they ought to be considered independent contractors whose negligence cannot form the basis for a claim under the FTCA. The

plaintiffs do not dispute that state firefighters are independent contractors within the meaning of the FTCA, but nonetheless assert that they had no role in maintaining the trailer. Rather, the plaintiffs assert that the trailer was maintained by Vehicle Maintenance, a group of federal employees. Thus, whether the plaintiffs' claims can escape the independent contractor exception turns on whether Vehicle Maintenance or state firefighters maintained the trailer.

The plaintiffs bear the burden of demonstrating that their claims arise from the actions of government employees. See Edison v. United States, 822 F.3d 510, 523 (9th Cir. 2016). The question of whether the allegedly negligent actors were employees of the federal government implicates the merits of the plaintiffs' claims, as well as the court's jurisdiction. See Begay v. United States, 188 F. Supp.3d 1047, 1082 (D.N.M. 2016); see also Arthur v. Holy Rosary Credit Union, 139 N.H. 463, 465 (1995) (under New Hampshire law, vicarious liability for negligence "ordinarily does not extend to torts by independent contractors because the employer reserves no control or power of discretion over the execution of the work"). Accordingly, I evaluate the parties' arguments utilizing the summary judgment standard.

Applying this standard, I conclude that the plaintiffs have supplied sufficient evidence to present a genuine dispute as to whether Vehicle Maintenance maintained the trailer. Dumais averred that state firefighters

were not permitted to use any tools on the trailer, and that only Vehicle Maintenance was permitted to service the trailer. Doc. 34-2 at 4. The plaintiffs also supplied work orders indicating that, on several occasions, Vehicle Maintenance inspected or otherwise serviced the trailer.[8] See, e.g., Doc. 34-10 at 23-32; Doc. 34-11 at 1-13. Additionally, there is evidence that, following the incident giving rise to the plaintiffs' claims, Vehicle Maintenance was tasked with evaluating the trailer. Doc. 34-11 at 22; Doc. 34-12 at 31.

Although the government offers affidavits averring that state firefighters were principally responsible for maintaining the trailer, this simply gives rise to a credibility determination that is reserved for the factfinder. See Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999). Because the plaintiffs have demonstrated that there is a genuine dispute as to who maintained the trailer, I decline to dismiss the plaintiffs' claims under the independent contractor exception.

---

[8]     The work orders in the record identify the serviced equipment only by its registration number and the servicing party by last name or employee number. The plaintiffs represent that the equipment referenced in the orders is the foam trailer, and that the servicing parties are members of Vehicle Maintenance. Doc. 34-1 at 5-6. The United States does not contest as much. Accordingly, for the purposes of the present motion, I accept as uncontested that the work orders in the record pertain to the trailer at issue and were completed by members of Vehicle Maintenance. See Int'l Union, United Gov't Sec. Officers of Am. v. Clark, 704 F. Supp.2d 54, 60 (D.D.C. 2010).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion to dismiss (Doc. 29) is granted in part and denied in part. The plaintiffs' claims may proceed, but only to the extent that they are premised on the negligent maintenance of the trailer.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

August 15, 2023

cc:  Counsel of record