# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Normand Dumais, Jr., et al.**

      v.

**United States of America, et al.**

Case No. 22-cv-112-PB
Opinion No. 2024 DNH 007

## MEMORANDUM AND ORDER

Normand Dumais and his spouse, Amanda Ames, have filed a complaint against the United States pursuant to the Federal Tort Claims Act (FTCA) seeking damages arising out of injuries Dumais suffered while working as a New Hampshire firefighter at the Pease Air National Guard Base. The government has responded with a motion to dismiss for lack of subject matter jurisdiction.

A federal court has subject matter jurisdiction to consider an FTCA claim only to the extent that "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The government argues that the court lacks subject matter jurisdiction because it would be considered Dumais' "borrowing employer" under New Hampshire law if it were a private person and thus immune from suit under the exclusivity provision of New

Hampshire's workers' compensation law. I agree, and therefore grant the government's motion to dismiss.

## I.    BACKGROUND[1]

Dumais was hired by the State of New Hampshire to work as a firefighter at the Pease Fire Department, which is located on the Pease Air National Guard Base in Newington, New Hampshire. Doc. 34-2 at 2-3. Firefighters assigned to the department provide firefighting services to the base as well as an adjacent civilian airport. Id. at 3. They also occasionally provide support to surrounding communities if called for mutual aid by other fire departments. Id. When the events that give rise to this action occurred, the only federal employee within the fire department was the base fire chief.[2] Doc. 29-3 at 3. All other members of the department were state employees, including two assistant fire chiefs and several captains and lieutenants. Id. at 4-5. The captains and lieutenants reported to the assistant fire chiefs, who in turn reported to the fire chief. Id. at 4-5, 20, 23. The fire chief did not exercise control over the firefighters and instead entrusted supervisory

---

[1]    I focus my discussion on the facts most relevant to the instant motion, but incorporate the facts more fully laid out in my prior order. See Dumais v. United States, 2023 DNH 101, 2023 WL 5237904 (D.N.H. Aug. 15, 2023).

[2]    In 2021, the New Hampshire National Guard transitioned all firefighters at Pease to federal employees. Doc. 29-5 at 5.

responsibilities to the assistant fire chiefs, captains, and lieutenants. Id. at 4-5.

The fire department was funded and operated pursuant to an Operations and Maintenance Master Cooperative Agreement (MCA) through which the United States agreed to provide funding in exchange for New Hampshire's agreement to provide certain services in support of the National Guard. Doc. 29-4 at 3, 13. The MCA consists of two parts. Id. at 16. The first part outlines "standard terms and conditions" that apply to the MCA as a whole. Id. It states, as relevant here, that New Hampshire "shall exercise its best efforts to supervise, manage, operate and/or maintain all activities or projects within the scope of this MCA . . . according to the terms, condition[s], and specifications of this MCA and its Appendices." Id. at 47. The second part includes various appendices that outline "specific terms and conditions" for each service that the state has agreed to provide. Id. at 16. Appendix 24 pertains to the state's "Air National Guard Fire Protection Activities (ANGFPA) Program," through which the firefighting services at Pease were operated. Id. at 70. One provision in Appendix 24 provides that "ANGFPA employees, work under the day to day supervision of the Base Fire Chief or his/her designee." Id. at 74.

Dumais was hired by the state pursuant to Appendix 24 to serve as a full-time firefighter at the Pease Fire Department. Doc. 44-2 at 3. While

working at the department, Dumais suffered serious injuries from a piece of federally-owned firefighting equipment that malfunctioned. Doc. 43 at 5. He received compensation for his injuries through the state's workers' compensation insurance plan. Doc. 29-2 at 47.

Pursuant to the FTCA, Dumais and Ames brought suit against the United States for negligence and loss of consortium. Doc. 43 at 5, 7. The government responded with a motion to dismiss for lack of subject matter jurisdiction, arguing that the plaintiffs' claims fall outside the FTCA's narrow waiver of sovereign immunity because the government would not be liable under state law if it were a private person. In the government's view, it was Dumais' borrowing employer and therefore immune from suit pursuant to New Hampshire's workers' compensation law.

## II.   STANDARD OF REVIEW

A defendant may attack the court's subject matter jurisdiction through a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) either by challenging the facial sufficiency of the plaintiff's jurisdictional claim or by questioning its factual basis. Torres-Negron v. J&N Records, LLC, 504 F.3d 151, 162 (1st Cir. 2007). Facial challenges are evaluated using the familiar plausibility standard that applies to motions to dismiss for failure to state a claim. Gordo-Gonzalez v. United States, 873 F.3d 32, 35 (1st Cir. 2017). Factual challenges, however, require different treatment. If the

relevant jurisdictional facts have no bearing on the merits of the parties' dispute, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Torres-Negron, 504 F.3d at 163 (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). But if the jurisdictional facts are intertwined with the merits, the court ordinarily must borrow the standard used to resolve summary judgment motions and may grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (quoting Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1558 (9th Cir. 1987)). Otherwise, the case must proceed to a trial, at which point jurisdiction will be reevaluated. Id.

In this case, the government has mounted a factual challenge to the court's subject matter jurisdiction and the jurisdictional facts are intertwined with the merits of the plaintiffs' FTCA claims. See Brownback v. King, 141 S. Ct. 740, 748 (2021) (noting that a lower court's determination that the United States would not be liable under state law passed on the merits of an FTCA claim as well as the court's subject matter jurisdiction). While this would ordinarily require the court to analyze the issue using the summary judgment standard, because the court acts as the ultimate finder of fact in FTCA cases, see 28 U.S.C. § 2402, it may exercise its discretion to make independent findings on the jurisdictional issue so long as the parties have

"an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss." Williamson v. Tucker, 645 F.2d 404, 414 (5th Cir. 1981); see Crawford v. United States, 796 F.2d 924, 929 (7th Cir. 1986) ("where there is no right to jury trial the judge may, if the jurisdictional issue requires for its sound disposition pretrial discovery and a full oral hearing, make that hearing the first stage of the trial."). Here, both sides agree that the issue is ready for resolution and neither seeks an evidentiary hearing. Accordingly, I determine the court's jurisdiction to hear the case by drawing on the record the parties have compiled and making any factual findings that may be required to resolve the issue.

## III.  <u>ANALYSIS</u>

The FTCA "allows a plaintiff to bring certain state-law tort suits against the Federal Government." Brownback, 141 S. Ct. at 745. The government has waived its immunity to suits brought under the FTCA and granted subject matter jurisdiction to federal district courts to hear FTCA claims, but only to the extent that a private person would be liable under state law for the same conduct. 28 U.S.C. §§ 1346(b)(1), 2674. Accordingly, "if a private person under 'like circumstances' would be shielded from liability pursuant to a state statute, lower courts must decline to exercise subject-matter jurisdiction." In re FEMA Trailer Formaldehyde Prods. Liab. Litig., 668 F.3d 281, 289 (5th Cir. 2012).

The government asserts that New Hampshire's workers' compensation law, N.H. Rev. Stat. Ann. § 281-A:8, confers such a shield. Section 281-A:8 provides that workers' compensation is the exclusive remedy for injured employees, thereby immunizing employers from tort claims brought by employees or their spouses. In re N.H. Dep't of Corrs., 162 N.H. 750, 753-754 (2011); see also O'Keefe v. Associated Grocers of New England, Inc., 117 N.H. 132, 134 (1977). The immunity provided by the statute applies to both "general employer[s]" and "borrowing employer[s]." LaVallie v. Simplex Wire & Cable Co., 135 N.H. 692, 694, 697 (1992). A borrowing employer is one who, for a particular purpose or period of time, obtains the rights to the services of another employer's employee, although the employee remains employed by his general employer. See id. at 694. Stated differently, "the servant of A may, for a particular purpose or on a particular occasion, be the servant of B, though he continues to be the general servant of A and is paid by him for his work." Indemnity Ins. Co. v. Cannon, 94 N.H. 319, 320 (1947).

To determine whether an entity is a borrowing employer under § 281-A:8, New Hampshire employs a multiple factor test substantially similar to the test enumerated in § 220 of the Restatement (Second) of Agency. LaVallie, 135 N.H. at 695; see also Petition of City Cab of Manchester, Inc., 139 N.H. 220, 221 (1994). Under this test, the court must consider "all relevant factors" given the "totality of the circumstances," including (1)

whether the employer enjoyed the right to control the details of the

employee's work, (2) whether the employee was "engaged in a distinct

occupation or business," (3) whether the employee's occupation was one in

which his work would generally be supervised by an employer, (4) the level of

skill required for the employee's position, (5) whether the employer supplied

the "instrumentalities, tools and the place of work," (6) whether the employee

was paid "by the time, or by the job," (7) whether the work performed by the

employee was "part of the regular business of the employer," (8) whether the

parties believed that they were creating an employment relationship, (9)

whether the employer enjoyed the right to "summarily discharge[]" the

employee, and (10) whether the employee explicitly or impliedly consented to

an employment relationship with the employer. LaVallie, 135 N.H. at 695-

696; see Appeal of Longchamps Elec., Inc., 137 N.H. 731, 735 (1993)

(hereinafter Longchamps). Whether an entity is an employer within the

meaning of § 281-A:8 is a question of fact, see Cont'l Ins. Co. v. N.H. Ins. Co.,

120 N.H. 713, 716 (1980); on which the defendant bears the burden of proof,

see Leeman v. Boylan, 134 N.H. 230, 234 (1991).

Although the parties agree that New Hampshire was Dumais' "general

employer," the government contends that it is immune from suit under § 281-

A:8 because it was his "borrowing employer." The government argues that, by

placing Dumais under the "day to day supervision" of a federal employee, the

MCA provided the government with the right to control the details of Dumais' work. In the government's view, this contractual delegation of control, along with the remaining LaVallie factors, indicates that it was Dumais' borrowing employer.

The plaintiffs object, arguing that the language of the MCA is ambiguous and that the evidence, viewed as a whole, demonstrates that the government did not have the right to control Dumais. The plaintiffs further contend that, even if the MCA did provide the government with a contractual right to control, it should be disregarded in light of the undisputed fact that the government did not ever exercise its right to control Dumais. Finally, the plaintiffs assert that the majority of the remaining LaVallie factors support their assertion that Dumais was not the government's borrowed employee.

## A.    Applying the LaVallie Factors

As both parties recognize, the historical facts of the case are largely undisputed. The parties' dispute, therefore, centers on how those facts inform the LaVallie test. Because it is at the center of the parties' dispute, I begin with the right to control before proceeding to the remaining LaVallie factors.

### 1.    Right to Control

The right to control factor looks to "[t]he extent of control which, by the agreement, the employer may exercise over the details of the work." LaVallie, 135 N.H. at 695. This factor weighs in favor of finding an employment

relationship where the purported employer has "the right to control not only

the results sought but also the means by which those results are achieved."

See NLRB v. Amber Delivery Serv., Inc., 651 F.2d 57, 61 (1st Cir. 1981)

(discussing the Restatement test); accord Longchamps, 137 N.H. at 736. In

determining whether an employer enjoys such a right, courts will often look

to the employment contract. See, e.g., LaVallie, 135 N.H. at 695-696; see also

Lex K. Larson, 5 Larson's Workers' Compensation Law § 61.05 (Matthew

Bender, Rev. Ed. 2023) (hereinafter Larson) (collecting cases and describing

"the employment contract itself" as "the best possible evidence" of the right to

control).

Appendix 24 of the MCA specifically provides that "ANGFPA

employees, work under the day to day supervision of the Base Fire Chief or

his/her designee." Doc. 29-4 at 74. The government has offered evidence, and

the plaintiffs do not dispute, that Dumais was considered an "ANGFPA

employee[]" under the MCA.[3] Doc. 44-2 at 3; Doc. 44-3 at 3.

The plaintiffs assert that this provision is contradicted by the MCA's

"standard terms and conditions" section, which states that New Hampshire

---

[3]     To be clear, the plaintiffs do not agree that Dumais was an "employee[]"
of the federal government. They do not, however, dispute that he would be
considered an "ANGFPA employee[]" as that phrase is used in the MCA. My
analysis focuses solely on the degree of control conferred by the MCA, and is
in no way impacted by the contract's use of the term "employee[]."

has the general duty to "supervise . . . all activities or projects within the scope of th[e] MCA." Doc. 29-4 at 47. That supervisory power, however, is not in conflict with the fire chief's supervisory power outlined in Appendix 24 because the MCA provides that the state's supervisory power must be exercised "according to the terms, condition[s], and specifications of this MCA and its Appendices." Id. Even if the two provisions were in conflict, the more specific provisions of Appendix 24 would control.[4] See Lawson v. FDIC, 3 F.3d 11, 17 (1st Cir. 1993) ("it is a familiar precept of contract interpretation that the specific controls the general."); accord Restatement (Second) of Contracts § 203(c). Thus, the MCA unambiguously gives the fire chief—a federal employee—the right to exercise "day to day supervision" over Dumais' work.

The phrase "day to day supervision" connotes, not merely the right to assign tasks, but also the right to control the manner and method of executing those tasks. See Bravo v. United States, 403 F. Supp. 2d 1182, 1194-1195 (S.D. Fla. 2005) (concluding that a contractual provision allowing an employer to exercise "day-to-day direction" over an employee

---

[4]     The plaintiffs' reliance on NGR 5-1, a regulation issued by the National Guard Bureau and incorporated into the MCA, is unavailing for similar reasons. NGR 5-1 states that grantees, such as New Hampshire, are responsible for "[s]upervising and managing all activities or projects within the scope of the [MCA] in accordance with sound business practices." Doc. 29-4 at 14. These general terms, which apply to all cooperative agreements entered into by the government, necessarily give way to the more specific terms of Appendix 24. See id. at 9.

unambiguously conferred a right to control the "detailed physical

performance" of the employee). Indeed, it is a phrase most frequently

associated with an employment relationship, to which the right to control is

central. See, e.g., United States v. Orleans, 425 U.S. 807, 815 (1976) (noting

that an employee is one whose "day-to-day operations are supervised by the

Federal Government"). Accordingly, with the benefit of the parties' briefing

on the matter, it is clear that the MCA's delegation of "day to day

supervision" to the fire chief provided the government with the right to

control the details of Dumais' work.

The plaintiffs assert that the MCA's delegation of control should

nonetheless be disregarded in light of the undisputed fact that the

government did not actually exercise control over the details of Dumais'

work. In support of their argument, the plaintiffs cite to Kowalski v. Shell Oil

Co., 588 P.2d 811 (Cal. 1979), and Schmidlkofer v. Industrial Commission, 61

N.W.2d 862 (Wis. 1953), as examples of cases where the court found that a

purported employer did not enjoy the right to control, notwithstanding a

contractual delegation of control.

Those cases, however, do not support the plaintiffs' contention that the

MCA should be disregarded. Each case turned on direct evidence that the

employer did not, in reality, retain the right to control seemingly provided for

by the contract. See Kowalski, 588 P.2d at 814 (testimony from the

12

defendant's employees that they had no right to control the plaintiff's work);

Schmidlkofer, 61 N.W.2d at 865 (evidence that the employer did not have the

right to control important aspects of the employee's work). Read in context,

neither case stands for the proposition advanced by the plaintiffs that

contractual delegations of control must be entirely disregarded where the

right to control is not exercised.[5] Rather, the cases simply recognize that

---

[5]      Even if the plaintiffs are correct that Kowalski and Schmidlkofer hold
that courts ought to disregard contractual delegations of control where no
control is exercised, the New Hampshire Supreme Court is unlikely to follow
suit. Although the New Hampshire Supreme Court cited to Kowalski in
Longchamps, it did so only for the purpose of drawing factual comparisons.
137 N.H. at 736. Because it had no bearing on the case at hand, the court did
not discuss Kowalski's conclusion that the jury was justified in finding that
the defendant did not enjoy the right to control the plaintiff notwithstanding
a contractual delegation of control, let alone indicate support for the
proposition that contractual delegations of control ought to be disregarded. To
the contrary, the court in Longchamps emphasized the importance of
contractual delegations of control by directing courts to consider "[t]he extent
of control which, by the agreement, the employer may exercise over the
details of the work." Id. at 734 (quoting LaVallie, 135 N.H. at 695). While it is
true that the "naked right to control" is insufficient to establish an
employment relationship standing alone, New Hampshire precedent makes
clear that a contractual right to control is nonetheless an important
consideration. See id. at 736 (citing to Barajas v. USA Petroleum Corp., 229
Cal. Rptr. 513, 518 (Cal. Ct. App. 1986)). Moreover, turning a blind eye to
contractual delegations of control would render New Hampshire an outlier:
Far from disregarding contractual delegations of control, courts generally
afford significant weight to such terms when determining who possesses the
right to control. See In re FedEx Ground Package Sys. Inc. Emp. Pracs. Litig.,
283 F.R.D. 427, 490 (N.D. Ind. 2008) (analyzing the law of several states and
noting that "courts looking for either a right to control or actual exercise of
control . . . needn't look further [than the employment agreement] if the
agreement creates a right to control"); see also Larson § 61.05 ("When the

factfinders faced with conflicting evidence on the right to control are not obligated to elevate the terms of the contract over contrary evidence.  See Kowalski, 588 P.2d at 816 ("a contract is not conclusive evidence of the existence of the right to control . . . ."); Schmidlkofer, 61 N.W.2d at 865 ("Writings attempt to define the status of the parties are important as evidence, but they are not controlling.").

That principle has little application to the instant case. Here, there is no evidence that the government did not have the right to "day to day supervision" over Dumais; rather, there is only evidence that the government did not directly exercise that right.[6] While the fact that the government did not actually exercise control over the details of Dumais' work may impact

---

degree of control is spelled out in the agreement, there are usually only two remaining questions: first, whether the extent of control so created indicates employment . . . and second, whether the agreement is bona fide and can be taken at its face value . . . .").

[6]     The plaintiffs point to deposition testimony by Lieutenant Colonel Ricker, the base civil engineer who supervised the fire chief, as evidence that the government did not have the right to control seemingly provided for by the MCA. In response to a question as to whether the chief would be "ultimately responsible" "if a state firefighting employee was not doing something properly," Ricker stated: "No. They're state employees. The fire chief only has a certain level of control, and ultimately personnel decisions are taken by the state." Doc. 46-2 at 9-10. Contrary to the plaintiffs' assertion, the testimony does not indicate that the fire chief lacked the right to exercise "day to day supervision" over the state firefighters; indeed, Ricker explained that the chief had a "certain level of control." Rather, the testimony stands only for the uncontested fact that the state was ultimately in charge of personnel decisions.

other factors in the analysis, it does not contradict or otherwise call into question the government's assertion that the MCA gave it the right to such control. Cf. Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 442 (1st Cir. 1966) (concluding that, where a principal had a contractual right to control an agent, the trial court did not err in excluding evidence as to whether the principal actually exercised that control because "[w]hat matters [under the Restatement test] is that it had the power"). After all, an employer may retain a right it chooses not to exercise. See Restatement (Second) of Agency § 220 cmt. d. And it is the right to control, rather than the exercise of control, that matters to the analysis. See Langfitt v. Fed. Marine Terminals, Inc., 647 F.3d 1116, 1121 (11th Cir. 2011) (noting that, under the Restatement test, "it is the right and not the actual exercise of control that is the determining element of employment"); Rohlsen, 360 F.2d at 442. For these reasons, "the absence of exercise of control has seldom been given any weight in showing absence of right to control," particularly where, as here, there is a contractual delegation of control. Larson § 61.05 (collecting cases) (emphasis in original).

Thus, I conclude that the government enjoyed the right to control the details of Dumais' work, which weighs heavily in favor of finding an employment relationship.

    2.   Remaining LaVallie Factors

In addition to the right to control, several of the other LaVallie factors
support the government's contention that it was Dumais' borrowing
employer. For example, Dumais was not "engaged in a distinct occupation or
business." LaVallie, 135 N.H. at 695. He did not own his own business or
otherwise seek to contract out his labor to multiple entities, but rather
worked full-time at the Pease Fire Department. Doc. 29-3 at 42. See
Restatement (Second) of Agency § 220 & cmt. h (noting that "full time
employment by one employer" is indicative of an employment relationship);
cf. Suskovich v. Anthem Health Plans of Va., Inc., 553 F.3d 559, 569 (7th Cir.
2009) (applying the Restatement test and noting that an individual was
engaged in a "distinct occupation or business" where he "started his own
business" and "contract[ed] his work out to a number of companies"); Briggs
v. Lawrence, 281 Cal. Rptr. 578, 584 (Cal. Ct. App. 1991) (applying the
Restatement test and noting that attorneys were not "engaged in a distinct
occupation or business" where they "devoted their full time to their duties as
public defenders for Monterey County").

Furthermore, Dumais was paid by the hour, rather than by the job.
Doc. 29-4 at 5. See Restatement (Second) of Agency § 220 & cmt. h (noting
that "payment by hour or month" indicates an employment relationship).
And, given the hierarchical structure of fire departments, it would be
customary for firefighters such as Dumais to work under the supervision of

16

their superiors, rather than be expected to make independent decisions about

their work.[7] <u>See</u> Restatement (Second) of Agency § 220 & cmt. h (noting that

"close supervision of the servant's work" is indicative of an employment

relationship).

In addition, Dumais' services were part of the "regular business" of the

federal government insofar as there was a "continuous, essential connection"

between his work and the operation of the military base. Petition of City Cab

of Manchester, Inc., 139 N.H. at 222. Air force installations, such as Pease,

require firefighting services in order to ensure the safe and effective

operation of aircraft. Doc. 29-3 at 3-4. Given the critical nature of fire

protection services, either state or National Guard firefighters were always

present at the base. Id. at 4; Doc. 46-3 at 3. In the absence of an MCA

---

[7]     The plaintiffs argue that whether Dumais was engaged in a distinct
business, paid by the hour, or in an occupation that is typically subject to
supervision goes to "whether a person is an employee or an independent
contractor" and "does not seem to inform the analysis under the borrowed
servant doctrine." Doc. 46-1 at 14-15. Although the Restatement test is
frequently used to distinguish between employees and independent
contractors, the New Hampshire Supreme Court adopted its factors in a
borrowing employer case, without any indication that those factors apply
differently in such a case. LaVallie, 135 N.H. at 695-696. Moreover, the New
Hampshire Supreme Court has subsequently applied those same factors in a
different borrowing employer case, where it explicitly analyzed the
employee's payment scheme and level of supervision. Longchamps, 137 N.H.
at 733, 737. Accordingly, there is no basis on which to conclude that such
factors are irrelevant or otherwise less important to the borrowing employer
analysis at issue here.

providing for firefighting services, fire departments at other air force installations are staffed by federal employees. Doc. 29-5 at 6. And where, as here, firefighting services are provided by the state pursuant to an MCA, state firefighters' salaries are fully reimbursed by the federal government, reflecting the government's determination that the firefighters "directly and completely support the National Guard's mission." Doc. 29-4 at 3-4.

Nonetheless, the plaintiffs assert that this factor should not weigh heavily in favor of finding an employment relationship because the fire department also served the adjacent civilian airport and responded to calls for mutual aid in the surrounding community. In the plaintiffs' view, that the department "did not exclusively serve the United States" undercuts the inference that Dumais was a federal employee. Doc. 46-1 at 13.

Contrary to the plaintiffs' argument, the evidence indicates that Dumais' work off-base was not separate and apart from his work for the federal government, but rather part and parcel of it. Appendix 24 requires the state to provide firefighting services, not only to the base, but also to other entities pursuant to "Mutual Aid/Reciprocal Agreements established at the local level." Doc. 29-4 at 71. There is no indication that the sort of "mutual aid" to the surrounding community referenced by the plaintiffs fell outside this provision of Appendix 24. Doc. 34-2 at 3. To the contrary, if it were the case that responding to emergencies off-base was performed at the

state's direction rather than pursuant to Appendix 24, the state would have been obligated to pay for such services. Doc. 29-4 at 72 ("Fire Department services deemed necessary by the [state] beyond the scope of services listed [in Appendix 24] will be supported by State . . . funds"). The state did not, however, pay for any portion of the state firefighters' salaries, which were fully reimbursed by the federal government. Id. at 4. Furthermore, the department continued to serve the civilian airport and surrounding community after transitioning all firefighters to federal employees, which indicates that such services fall within the scope of the federal government's work. See Doc. 29-5 at 4-5. Accordingly, Dumais' work was part of the "regular business" of the government, even if entities other than the government ultimately benefitted from that work.

The government's assertion that it was his borrowing employer is further supported by the fact that the federal government supplied Dumais' place of work and many of his tools, including firefighting equipment of substantial value. Doc. 29-3 at 4. This is a strong indication of an employment relationship because, as the comments to the Restatement point out, "if [a] worker is using his employer's tools or instrumentalities, especially if they are of substantial value, it is normally understood that he will follow the directions of the owner in their use." Restatement (Second) of Agency § 220 cmt. k.

19

The plaintiffs do not dispute that the fire department was located on federal property and utilized federally-owned equipment, but nonetheless contend that this factor does not weigh in favor of finding an employment relationship. In the plaintiffs' view, that the government owned the firefighting equipment is of little value where, as here, it did not exert control over the use of that equipment. But, contrary to the plaintiffs' assertion, Dumais averred that state firefighters were not permitted to perform maintenance work on federal equipment, which indicates that the government placed at least some restrictions on the use of its equipment. Doc. 34-2 at 4. In any event, that the government owned the equipment and had a contractual right to exercise "day to day supervision" over the state firefighters indicates that the government was entitled to direct the use of its equipment, even if it seldom exercised this right.

Finally, the evidence indicates that Dumais consented to an employment relationship with the government. The test for consent "is an objective one, and the employee may be shown to have consented either expressly or impliedly." Langfitt, 647 F.3d at 1126 (emphasis in original); accord Longchamps, 137 N.H. at 737. Implied consent "may be gleaned from the employee's conduct and the nature of the employee's relationship with the borrowing principal," regardless of whether the employee subjectively believed that he was entering into an employment relationship. Langfitt, 647

20

F.3d at 1126.

Implied consent is most frequently evinced by an employee's acceptance of his employer's direction which, as the plaintiffs note, is lacking here because the government concedes that it did not exercise control over Dumais. Nonetheless, the nature of the parties' relationship and Dumais' conduct within it indicates that Dumais impliedly consented to an employment relationship with the government.

It is not the case that Dumais was hired by the state and then temporarily assigned to work on a military base. Cf. Longchamps, 137 N.H. at 737 (finding no implied consent where the employee was sent by his general employer to perform work for a third party on a temporary basis). Rather, Dumais resigned from his prior position with the state so that he could specifically pursue a permanent, full-time position at Pease. Doc. 29-3 at 42; Doc. 46-3 at 3. Dumais proceeded to work at the fire department for over a year which is, in and of itself, indicative of consent. See Langfitt, 647 F.3d at 1126 ("A long-term employment relationship with a borrowing principal strongly suggests that the employee consented to being a borrowed servant."); accord Restatement (Second) of Agency § 220 cmt. h (noting that "employment over a considerable period of time with regular hours" is indicative of an employment relationship).

Furthermore, given Dumais' training and experience, he was

undoubtedly aware that fire chiefs customarily enjoy the right to issue commands to subordinate firefighters. Cf. N.H. Rev. Stat. Ann. § 154:2, I (providing that, in fire departments organized under the laws of New Hampshire, "fire chiefs shall have the authority and the control of all firefighters and officers"). Dumais had no reason to believe that the Pease Fire Department departed from this practice, particularly given that the chief of the department was an experienced firefighter who possessed the knowledge and expertise needed to command firefighting operations. Doc. 29-3 at 2, 34. Cf. Longchamps, 137 N.H. at 733 (finding that a company was not a worker's borrowing employer where there was no evidence that any of the company's agents were qualified to direct the worker's electrical work). Thus, Dumais was likely aware that the fire chief had the power to issue orders through the fire department's chain of command.

Moreover, given that the fire chief was a uniformed member of the military, Dumais was likely aware that the chief was a federal employee. Doc. 46-3 at 1. Accordingly, Dumais knew or should have known that he worked under the ultimate control of a federal employee. Dumais' continued employment under these circumstances indicates that he objectively consented to federal employment, even if he did not subjectively believe that he was doing so. See Prodanic v. Grossinger City Autocorp, Inc., 975 N.E.2d 658, 664 (Ill. App. Ct. 2012) ("Implied consent exists where the employee

knows that the borrowing employer generally controls or is in charge of the employee's performance.").

While most of the LaVallie factors support the government's argument that it was Dumais' borrowing employer, three of the factors counsel against finding an employment relationship. First, Dumais did not subjectively believe that he was a federal employee. Doc. 34-2 at 2. Second, although the fire chief had the right to "be involved in all personnel actions concerning the State employees," he did not have the right to unilaterally fire Dumais. Doc. 29-4 at 75. Third, firefighting is a skilled occupation. See Longchamps, 137 N.H. at 737 (concluding that an electrician apprentice was in a skilled occupation, even though he was still in training).

The question then becomes whether the LaVallie factors, on balance, indicate that the government was Dumais' employer.

## B.   Balancing the LaVallie Factors

As I explained, the determination of whether an entity is a borrowing employer requires a consideration of the totality of the circumstances, in which no one factor is necessarily determinative. Nonetheless, some factors necessarily carry more weight than others. See Wilson v. Nooter Corp., 475 F.2d 497, 502 (1st Cir. 1973).

In the context of this case, many of the factors that counsel against finding an employment relationship should be afforded comparatively little

weight. While it is true that working in a skilled occupation generally counsels against a finding of employment, "if the occupation is one which ordinarily is considered . . . an incident of the business establishment of the employer, there is an inference that the [worker] is a servant," particularly where the worker is "regularly employed." Restatement (Second) of Agency § 220 cmt. i. Such is the case here: Dumais worked full-time at a fire department that performed the work of the federal government in a role that is often (and presently) filled by federal employees. Similarly, although Dumais did not believe that he was in an employment relationship with the government, such beliefs are only relevant "insofar as [they] indicate[] an assumption of control by the one and submission to control by the other." Id. at cmt. m. Thus, Dumais' beliefs fall into relative insignificance where, as here, there is a contractual delegation of control and implied consent. Finally, although the fire chief could not personally terminate Dumais, his right to "be involved in" and "provide input into" the state's termination decisions tempers the force of this factor. Doc. 29-4 at 75; Doc. 29-3 at 5.

In contrast, many of the factors that weigh in favor of finding an employment relationship are afforded significant weight. For example, utilizing the government's equipment is a strong indication of employment, particularly where, as here, the equipment is of substantial value. See Restatement (Second) of Agency § 220 cmt. k; Larson § 61.07 ("When the

employer furnishes valuable equipment, the relationship is almost invariably that of employment.").

It is also notable that Dumais impliedly consented to an employment relationship with the government. While consent is not a necessary prerequisite to an employment relationship under New Hampshire law, it is nonetheless an important consideration in cases such as this, where the issue is whether the employee forfeited the right to sue by entering into a new employment relationship. See Longchamps, 137 N.H. at 735. The presence of consent here is, therefore, compelling.

Similarly, that the government had the right to control the details of Dumais' work is a particularly forceful consideration. Indeed, courts have recognized that the right to control is among the most important factors and warrants significant weight. See Cont'l Ins. Co., 120 N.H. at 717 (quoting Hunter v. R.G. Watkins & Son, Inc., 110 N.H. 243, 246 (1970)) ("When a case involves borrowed servants . . . 'control may be a decisive factor'"); Swiezynski v. Civiello, 126 N.H. 142, 145 (1985) ("The dispositive characteristic of an employer's status is his right to control the employee's work performance"); see also Restatement (Second) of Agency § 220 cmt. d ("control or right to control the physical conduct of the person giving service is important and in many situations is determinative . . . ."); Thompson v. Grumman Aerospace Corp., 585 N.E.2d 355, 357-358 (N.Y. 1991) (noting that, although "[m]any

factors are weighed in deciding whether a special employment relationship exists, and generally no one is decisive . . . a significant and weighty feature has emerged that focuses on who controls and directs the manner, details and ultimate result of the employee's work").

These three factors in particular distinguish the instant case from Longchamps, where the New Hampshire Supreme Court affirmed an administrative decision finding that an apprentice electrician temporarily assigned to perform work for a construction company was not a borrowed employee. 137 N.H. at 732-733. In that case, as in this case, the company did not exert control over the worker, the worker's occupation required significant skill, and the company could not fire the worker. Id. at 736-737. However, unlike the instant case, the company did not supply the worker's tools or enjoy the right to control the details of his work, and the worker did not consent to an employment relationship with the company. Id. at 735-737.

Instead, this case is more in line with LaVallie, where the New Hampshire Supreme Court affirmed a grant of summary judgment finding that a temporary laborer was a borrowed employee of the defendant. 135 N.H. at 696. There, as here, an employment contract placed the plaintiff under the control of the defendant, the plaintiff impliedly consented to an employment relationship with the defendant, and the plaintiff was paid by the hour. Id.; see also Longchamps, 137 N.H. at 735 (noting that, although

the court in <u>LaVallie</u> did not explicitly discuss consent, it was nonetheless clear that the plaintiff impliedly consented to an employment relationship).

Considering the balance of the <u>LaVallie</u> factors under the totality of the circumstances, I conclude that the government was Dumais' borrowing employer. Because the plaintiffs' claims would be barred by § 281-A:8 if brought against a private actor under like circumstances, they fall outside the FTCA's waiver of immunity and must be dismissed for lack of jurisdiction.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the government's second motion to dismiss (Doc. 44) is granted and the United States is dismissed as a party from this action.


SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

February 2, 2024

cc:      Counsel of record